## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRIENDS OF ANIMALS, | ) | |
| 777 Post Road, Suite 205 | ) | Civ. No. 16-216 |
| Darien, CT 06820; and | ) | |
| | ) | |
|      Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAN ASHE, in his official capacity | ) | |
| as Director of the | ) | |
| U.S. Fish and Wildlife Service, | ) | |
| Department of the Interior | ) | |
| 1849 C Street, N.W. | ) | |
| Washington D.C., 20240; and | ) | |
| | ) | |
| UNITED STATES FISH AND WIDLIFE SERVICE, | ) | |
| an agency of the United States, | ) | |
| 1849 C Street, N.W. | ) | |
| Washington D.C., 20240 | ) | |
| | ) | |
|      Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## PRELUDE

*Like people, elephants can also become victims of past traumas and exhibit symptoms of PTSD years after the experience.*

--G.A. Bradshaw, Ph.D & Lorin Linder, Ph.D



The tearful right eye of an elephant is pictured at a
zoo in Leipzig, Germany, on August 7, 2013
(Photo: Peter Endig/AFP/Getty).

Post-traumatic stress disorder (PTSD) is a condition that describes anxiety-based responses to life-threatening events. Traumatic stress is different from other types of stress because the individual's existence is physically and emotionally threatened and s/he is unable to escape. While environmental threats such as hurricanes can be terrifying, in many cases they appear to cause less ill effects than do human-caused traumas. Victims are usually able to anticipate natural disasters and make attempts to avoid harm. Events or "stressors" that underlie the development of PTSD include threat of death; physical abuse; deprivation; torture; isolation; forced incarceration (captivity); and witnessing the loss, death or threat of death to a loved one. All elephants in captivity have experienced most, if not all, of these events. Bradshaw & Linder, *Post-Traumatic Stress and Elephants in Captivity.*

* *

Splitting up of familiar bonds is known to be highly cruel and traumatic to elephants—in those that are sent as well as in those that remain behind. Evidence has shown that trauma remains embedded in the elephant's brain for life. Although the juveniles will most probably know each other, it appears that they will not have their entire families, or their mothers with them. This is deeply unethical and will cause severe trauma, which can have life-long manifestations. IUCN, Elephant Specialist Advisory Group, *Statement regarding the proposed sale and transfer of 18 elephants from Swaziland to three Zoos in the USA.*

## INTRODUCTION AND SUMMARY OF COMPLAINT

1.     Aristotle said that elephants are "the animal which surpasses all others in wit and mind." Recent studies of the elephant's behavior and brain have confirmed what was evident to the ancient Greek philosopher: elephants have an extremely high level of intelligence and social awareness. Elephants have a strong sense of self and family. Elephants mourn the death or loss of family members. In the wild, elephants learn, play, and show compassion to others in their family.

2.     Conversely, elephants captured from the wild and forced into captivity suffer from depression, anxiousness, mood swings, and fear. They also exhibit higher rates of disease and disability. No wonder it has been shown that zoo elephants simply do not live as long as those in the wild.

3.     With growing consensus among the experts that life in captivity, even when held in some of the most animal-centric zoos in the world, is physically and emotionally painful for an elephant, there is pressure on zoos worldwide to phase out elephant exhibitions. Indeed, due to the practical and ethical concerns associated with keeping elephants in captivity, it is getting harder to find these animals on exhibit in U.S. zoos.

4.     However, three zoos—the Dallas Zoo, the Sedwick County Zoo in Wichita, Kansas, and Omaha's Henry Doorly Zoo (collectively, "Zoos")—are currently seeking to import up to 18 elephants captured from the wild in Swaziland. Notably, if these Zoos succeed, they will be removing nearly half of all the remaining African elephants in that country—leaving behind approximately 21.

5.     Swaziland officials have claimed that elephants are overrunning their country, and that if 18 are not captured and sent to the Zoos, it will be forced to kill them outright. This is a claim that Swaziland has made in the past. Independent observers, however, assert that Swaziland mismanages the elephants, improperly confining them to small areas where they naturally overgraze and impact the land. Moreover, there is no evidence to show that Swaziland has made any serious attempt to expand elephant habitats in its territory or to

work with other African countries, parks or sanctuaries to keep these elephants in Africa and in the wild.

6.  Many independent observers and elephant advocates strongly believe the motive behind this transfer is simply a business transaction. The Zoos involved have invested more than $25 million in elephant exhibits and need elephants to fill them. Likewise, Swaziland, which is a monarchy run by a king, is looking to make a profit on their sale. And this is not the first time. In 2003, Swaziland sold 11 elephants to U.S. zoos for a profit of about 133,000 U.S. dollars.

7.  Because Swaziland's African elephant population is protected by international agreements and U.S. law, the Zoos were required to obtain a permit from the U.S. Fish & Wildlife Service (FWS) to transport of these elephants across the world and relocate them to enclosures at the Zoos' U.S. facilities.

8.  Leading experts in conservation and biology spoke out against the importation, and thousands of members of the public asked FWS not to issue the permit. Many, including Friends of Animals (FoA), demanded that FWS examine the social, behavioral, and physical impacts on the elephants to be imported, and their family members that are left behind. FWS ignored these calls.

9.  On January 22, 2016, FWS published notice of a Final Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) under the National Environmental Policy Act (NEPA) notifying of its intent to grant the Zoos a permit to import up to 18 live African elephants from Swaziland. The EA failed to publically disclose or analyze the social, behavioral, and physical impacts on the elephants.

10.  Not only was FWS's decision a devastating blow for these 18 elephants—who now face the possibility of being ripped away from their existing lives in the wild, years of confinement and misery, and mostly likely much shorter lifespans—it was also illegal.

11.  Under NEPA, FWS has a mandatory duty to fully evaluate and disclose all environmental impacts associated with the issuance of this permit. This includes

addressing the growing scientific evidence that, as a result of issuing the permit, these elephants will suffer social, psychological, behavioral, and physical impacts for the rest of their lives.

12.    Similarly, FWS was obligated to examine and disclose whether large numbers of Americans might also be affected by this decision. Just as people react to human rights abuses with a range of emotions—disgust, anger, hate, sadness, empathy, etc.—we can, and often do, react similarly when an animal is intentionally hurt or injured. As a result of FWS's permitting decision, many Americans, including some who are FoA members and supporters, will have difficulty visiting these Zoos (and others) knowing that these 18 elephants (and others) are suffering social, behavioral and physical distress due to their captivity. FWS had a duty to examine and disclose these impacts on the human environment as well.

13.    FWS's failure to fully disclose or analyze the social, physiological, behavioral, and physical impacts on the elephants to be imported and the elephants remaining in Swaziland was not harmless error. NEPA is intended to provide information to the agency decision-makers and the public that would be crucial to making an informed decision as to whether or not the requested permit should or could be issued. Thus, the missing information might have led to a different outcome in the permitting decision. For instance, this information would be relevant to whether or not the Zoos are suitably equipped to house and care for these elephants, a finding FWS is required to make under the applicable U.S. and international law. Disclosure of this information might also cause the Zoos themselves—which purport to seek the best for these animals—to reconsider their request for a permit. Finally, disclosure might create more pressure on, and support for, the government of Swaziland—from governments, NGOs, private institutions (including some zoos and universities), and individuals—to pursue alternative means to keep these animals in the wild.

14.    Because FWS failed to fulfill its mandatory duties under NEPA in these respects,

Friends of Animals comes now before this Court seeking injunctive and declaratory relief. Specifically, Friends of Animals requests that the Court declare that in approving this permit, FWS violated NEPA and that the Court enjoin the permit to prevent the proposed transfers until such time as FWS fully complies with NEPA and all other relevant laws.

## JURISDICTION

15.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act). This Court may grant the relief requested under 28 U.S.C. §§ 2201-2202 (declaratory and injunctive relief) and 5 U.S.C. §§ 701-706.

16.   Venue lies in the District of Columbia pursuant to 28 U.S.C. 1391(e) because the Defendants have their principal offices in this District; and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

17.   Plaintiff, FRIENDS OF ANIMALS ("FoA"), sues on behalf of itself and its adversely affected members. FoA is a nonprofit, international animal advocacy organization incorporated in the state of New York since 1957. FoA seeks to free animals from cruelty and exploitation around the world, and to promote a respectful view of non-human, free-living, and domestic animals. FoA engages in a variety of advocacy programs in support of these goals. FoA informs its members about animal advocacy issues as well as the organization's progress in addressing these issues through its magazine called *Action Line*, its website, and other reports. In particular, FoA has a long-standing commitment to protecting animals imperiled due to animal-exploitation markets.

18.   FoA actively works to protect African species in their native habitats. FoA funds and participates in habitat restoration and recovery efforts for threatened and endangered African animals. FoA regularly monitors Federal Defendants' compliance with federal laws and international agreements. FoA relies on Federal Defendants' NEPA documents, and the

information contained therein, to draft articles and reports, and to update its members. FoA regularly comments on environmental assessments and environmental impact statements regarding actions that affect animals subject to exploitive markets, such as zoos. FoA submitted comments in opposition to the importation of elephants from Swaziland to Zoos. FoA requested that the government make a publically available analysis on the impacts of the elephants both in Swaziland as well as the impact of such action on those elephants proposed to be transported across the world to be held in captivity at Zoos.

19.   FoA has members who live in or visit Texas, Nebraska, and Kansas, where the three Zoos seeking the elephants are located, who would be distressed if the Zoos are allowed to proceed with the importation and exhibit of elephants. One member, who previously worked at the Dallas Zoo, regularly observed elephants during employment and visits, but has had a difficult time doing so after learning about the problems caused by keeping elephants in zoos. This member quit working at the Dallas zoo, in part due to the treatment and confinement of certain animals, such as elephants. However, the member continues to visit the zoo with her family and would like to continue to visit the zoo to observe other animals. If the Zoos take additional elephants from the wild, this member, as well as others, will either no longer visit or no longer be able to enjoy their visits to the Zoos because of the confinement of elephants taken from the wild in Swaziland. The thought of seeing such elephants in captivity causes FoA's members great harm. Members suffer harm thinking of the transport of elephants from the wild and subsequent captivity in Zoos.

20.   FoA members reasonably anticipate that if imported, the elephants will have difficulties transitioning to life in Zoos.  These elephants are likely to suffer post-traumatic stress disorder from being separated from family members in Swaziland, transported across the world, and confined in a foreign place. FoA members know that elephants suffering from this trauma will likely be unable to feel happiness or joy and will experience a loss of purpose in life, paranoia, hyper-vigilance, an exaggerated startle response, and

7

sudden outbursts of anger.  Physical symptoms of such trauma are often observed in the form of head-bobbing, pacing, repeated trunk weaving, infanticide, aggression, self-mutilation, and other "dangerous behaviors." Such symptoms are easily observable at the zoo, especially for those with knowledge of elephants.

21.   Many Friends of Animals members simply feel that Zoos do more harm to animals than good. Other, however, feel that while some animals should never be held in captivity, zoos can contribute to conservation by promoting scientific research and by exposing the public to animals for which encounters in the wild are not always possible, either because of the animal's rarity or the cost of traveling to other parts of the world.  In any case, for those members that visit the Zoos at issue here, they are very likely to experience aesthetic, emotional, and spiritual harm from seeing (or hearing) elephants that have been torn from their homes in Swaziland.

22.   FoA members also participate in, or operate, photographic safaris in or around Swaziland. These members would like to see the elephants in the wild rather than in zoos.

23.   FoA members who travel to, work in, and reside in Swaziland derive ongoing and lasting recreational, aesthetic, professional, moral, and spiritual benefits from observing elephants in their native habitat and knowing that elephants live in the wild. Some of these members actively worked to offer Swaziland assistance with its elephants.

24.   FoA and its members' interests have been harmed and will continue to be harmed by FWS's issuance of a permit authorizing the importation of threatened African elephants, such as the permit at issue here.  FoA's members are concerned that the transaction will remove animals from their native habitats and make it more difficult to view elephants in Swaziland. The proposed importation of elephants and resulting destruction of their family groups and physiological damage would cause FoA members anguish and pain.

25.   As a result of the issuance of the Permit, FoA members reasonably fear that their future opportunities to observe African elephants in the wild will be diminished and their enjoyment, when they do observe elephants, and other wild animals will be decreased.

26.    As a result of FWS's failure to conduct an appropriate environmental analysis under NEPA, Friends of Animals, and its members, were deprived in the ability to participate in the decision-making process and be fully informed about the impact FWS's action would have on these 18 elephants and those left behind in Swaziland.

27.    The above-described interests of Friends of Animals and its members have been, are being, and unless the relief prayed for herein is granted, will continue to be adversely affected by FWS's disregard of their statutory duties under federal and international laws, and by the resulting unlawful harm imposed upon threatened African elephants.

28.    The relief requested in this lawsuit can redress these injuries by ensuring that Federal Defendants do not authorize the importation of elephants from the wild into a life of captivity in Zoos in the United States without full consideration of the impacts.  An order preventing the importation of threatened elephants, until compliance with all applicable federal and international laws, will discourage the detention of animals in captivity for display and profit.  Such relief will also reduce the international transportation and trade of threatened elephants. At the very least, the relief requested ensures Federal Defendants employ a more transparent and informed decision-making process when determining whether to issue a permit for the importation of threatened animals from the wild.

29.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE, is an agency housed in the U.S. Department of Interior. FWS is responsible for issuing the permit at issue. In doing so, FWS must comply with the ESA, CITES, NEPA, and all other applicable laws.

30.    Defendant DAN ASHE is the Director of the U.S. Fish and Wildlife Service (FWS).  In this official position, he is responsible for ensuring that FWS comply with the ESA, CITES, NEPA, and all other applicable laws.

## FACTUAL BACKGROUND

**A.      African Elephants: Description and Status.**

31.    African elephants, *Loxodonta Africana*, are the largest land animals on Earth. They are slightly larger than their Asian cousins and can be identified by their larger ears that look somewhat like the continent of Africa. (Asian elephants have smaller, rounded ears).

32.    Elephants eat roots, grasses, fruit, and bark, and they eat a lot of these foods. An adult elephant can consume up to 300 pounds (136 kilograms) of food in a single day.

33.    These hungry animals do not sleep much, and they roam over great distances while foraging for the large quantities of food that they require to sustain their massive bodies. In the wild, an elephant's home range is as much as 500 square miles.

34.    Female elephants (cows) live in family herds with their young, but adult males (bulls) tend to roam on their own.

35.    National Geographic has described having a baby elephant as "a serious commitment." Elephants have a longer pregnancy than any other mammal—almost 22 months. Cows usually give birth to one calf every two to four years. At birth, elephants already weigh some 200 pounds (91 kilograms) and stand about 3 feet (1 meter) tall.

36.    African elephants, unlike their Asian relatives, are not easily domesticated.

37.    They range throughout sub-Saharan Africa and the rain forests of central and West Africa. The continent's northernmost elephants are found in Mali's Sahel desert. The small, nomadic herd of Mali elephants migrates in a circular route through the desert in search of water.

38.    African elephants are found in Eastern, Southern, Central, and West Africa.

39.    Preliminary genetic evidence suggests that there may be at least two species of African elephants, namely the Savanna Elephant (*Loxodonta africana*) and the Forest Elephant (*Loxodonta cyclotis*). A third species, the West African Elephant, has also been postulated. The African Elephant Specialist Group, formed by the International Union for Conservation of Nature (IUCN), believes that more extensive research is required to

10

support the proposed re-classification. The concern is that premature allocation into more than one species may leave hybrids in an uncertain conservation status. For this reason, in assessing the status of the African elephants in the wild, IUCN treats all wild populations as a single species.

40.    The IUCN considers the African Elephant as a species to be vulnerable. A taxon is Vulnerable when the best available evidence indicates that it meets any of certain IUCN criteria for Vulnerable, and it is therefore considered to be facing a high risk of extinction in the wild.

41.    Among conservation organizations, habitat loss is considered one of the key threats facing elephants. Climate change projections indicate that key portions of elephants' habitat will become significantly hotter and drier, resulting in even poorer foraging conditions in the future. Increasing conflict with human populations taking over more and more elephant habitat and poaching for ivory are additional threats that are placing the elephant's future at risk."

**B.     African Elephants: Cognition.**

42.    Scientists have carefully catalogued astounding examples of elephant intelligence and emotional capacity for many decades. Scientific American recently published an article stating that "scientists now have solid evidence that elephants are just as brilliant as they are big: They are adept tool users and cooperative problem solvers; they are highly empathetic, comforting one another when upset; and they probably do have a sense of self." Ferris Jabr, *The Science Is In: Elephants are Even Smarter Than we Realized*, Science America (Feb. 16, 2014).

43.    Elephants are highly social animals that form strong, permanent bonds with their family or herd. Female elephants will generally remain with their herd for their entire life.

44.    An elephant's capacity for grief and sadness rivals our own. It is well established that elephants remember and mourn dead family members for years, and even decades

after their deaths.  Elephants have been observed to stand over a stillborn baby for days with their head and ears hanging down, quiet and moving slowly as if they are depressed. Others have observed orphaned elephant babies that have seen their mothers shot wake up at night screaming.

45.  Cynthia Moss, the director of the Amboseli Elephant Research Project, has studied African elephants for over forty years. She continually documented the grief that elephants go through when a member of their family is killed. In one account she described the response of elephants when a member of the herd had been shot:

> Teresia and Trista became frantic and knelt down and tried to lift her up. They worked their tusks under her back and under her head. At one point they succeeded in lifting her into a sitting position but her body flopped back down. Her family tried everything to rouse her, kicking and tusking her, and Tullulah even went off and collected a trunkful of grass and tried to stuff it in her mouth.

Cynthia Moss, *Elephant Memories: Thirteen years in the life of an elephant family*, 73 (University of Chicago Press 2000).

**C.    African Elephants: Impacts of Separation and Captivity.**

46.  Extensive research by elephant ecologists and welfare specialists shows that captivity is detrimental to elephants. As sentient animals reliant on family bonds, elephants in zoos display behavioral abnormalities and suffer from increased disease or disability caused by captive environments.

47.  Dr. Joyce Poole, a world expert on elephant social behavior and communication, explains "elephants are highly intelligent, sensitive and social individuals and nothing can justify tearing young elephants away from their mothers and social groups and incarcerating them for the rest of their lives." Melissa Reitz, *Swaziland Elephant Export Ignores Alternative*, Conservation Action (Oct. 28, 2015).

48.  When elephants are confined in small areas they endure severe physical and physiological hardships, especially when they have spent their entire lives in the wild.

49.    Transporting elephants from Africa to the U.S. will cause the elephants a great deal of stress and psychological harm. During transport, the animals often endure extreme temperature and pressure changes, noise, vibrations, and inadequate space. It is well documented that animals have a much greater chance of developing health problems and dying at a much earlier age when they are transported overseas and endure these stress factors.

**D.      The Changing Views in Elephant Captivity At Some U.S. Zoos.**

50.    On July 11, 2014, the Wall Street Journal ran a story under the byline "In U.S. Zoos, Elephants Get Harder to Find." Part of the reason for the reduction of elephants confined in U.S. zoos in recent years has to do with a change in federal regulation requiring larger enclosures and minimum group sizes.  But the reduction is also being fueled by greater recognition of the detrimental impacts to elephants captive in zoos, circuses and other entertainment-related facilities.

51.    Many zoos around the world have closed their elephant exhibits. In 2004, the Detroit Zoo sent their elephants to a refuge and shut down their elephant exhibit. The zoo director explained that despite the fact that the Detroit Zoo had been a leader in animal care, zoos do not provide adequate habitat for animals that are as large and intelligent as elephants.

52.    In 2004, the San Francisco zoo closed its elephant exhibit after four elephants died in one year. The zoo acknowledged that urban environments are not adequate for elephants.

53.     In 1999, the Louisiana Purchase Gardens and Zoo retired their elephant, Shirley, to The Elephant Sanctuary because they found that was in her best interest.

54.    Numerous other zoos have closed their elephant exhibits and many others plan to after their current elephants die. In 2009, India's Central Zoo Authority issued a directive

stating that all elephants living in zoos must be moved to wildlife parks and sanctuaries where they can graze more freely.

55.    Despite the detrimental impacts of captivity and public safety threats, elephants in zoos can attract more visitors and generate millions of dollars. Indeed, the Zoos seeking to import these 18 elephants from Swaziland anticipate that the importation of the elephants will drive ticket sales, economically benefiting the Zoos. The Zoos also anticipate that displaying the elephants will result in increased donations and grants for the Zoos.

56.    The Zoos at issue here also seek to import elephants for the purpose of breeding. However, the Zoos have no long-term plan to use the imported elephants or their progeny to aid in the species recovery in the wild.

**E.      The Kingdom of Swaziland and Its Management of Elephants.**

57.    The Kingdom of Swaziland is Africa's last remaining monarchy. Currently, King Mswatii III rules by decree over his millions of subjects. He took the throne in 1986 after his father, King Sobhuza II died.

58.    King Mswatii III has long been criticized for living in lavish wealth while many of his people live in chronic poverty. It has been reported that he has thirteen royal palaces, fleets of top-of-the-line Mercedes and BMWs, and a seventeen-million dollar private jet.

59.    The precise source of King Mswatii III's wealth has been kept secret.

60.    The monarchy has created institutions that appropriate public revenue to enrich the royal family instead of the people and wildlife.

61.    There are three game parks in Swaziland, all of which are run by Big Game Parks. Big Game Parks is a private body that is overseen by the King and privately owned by CEO, Mr. Ted Reilly.

62.    The King delegated the management and administration of all wildlife international agreements and conventions to one party—Big Game Parks.

63.    Big Games Parks manages three wildlife areas covering approximately 36,560

hectares of land:  Hlane Royal National Park, Mlilwane Wildlife Sanctuary, and Mkhaya Game Reserve.

64.   Swaziland has approximately thirty-nine elephants that reside in Hlane Royal National Park and Mkhaya Game Reserve.

65.   Swaziland's current elephant population comes from approximately eighteen baby elephants that were imported from Kruger National Park in South Africa to Swaziland in 1987, after the local population had been extirpated from South Africa as a result of hunting and poaching. In 1994, Swaziland imported an additional nineteen baby elephants from Kruger National Park.  Over time, these elephants formed close social bonds and some have mated and produced offspring.

66.   This is the second time in just over a decade that Swaziland and U.S zoos have sought to profit over trading elephants for money.

67.   Around 1999, the San Diego Wild Animal Park began making inquiries to Mr. Reilly about importing seven of Swaziland's young elephants.

68.    Sometime in 2001, Mr. Reilly issued a statement in which he explained that Swaziland's elephant population had reached approximately thirty-one to thirty- seven elephants. According to Mr. Reilly, this number exceeded carrying capacity on lands in Swaziland provided for elephants.

69.   In 2003, Swaziland successfully sold eleven elephants to American zoos for 133,000 USD.

70.   Mr. Reilly claimed he intended to use the money to expand protected habitat and protective fencing so that there could be more space for elephants in the future.

71.   In fact, Swaziland's elephants are now confined to a small areas within the Parks. The "elephant range" in Swaziland consists mainly of two small fenced enclosures comprising 6% and 19% of two fenced reserves (Hlane Royal National Park at 142km$^2$ and Mkhaya Game Reserve at 65km$^2$). These enclosures contain the country's populations of elephants, numbering 19 and 13 respectively in 2012. Essentially, the Swaziland elephants,

which were introduced as orphans from culls in Kruger National Park, South Africa, between 1986 and 1994, are kept as a tourist attraction and symbol of national prestige.

72.   There is no evidence that a signification portion of this money went to conservation rather than the King of Swaziland or the CEO of Big Game Parks.

73.   According to FWS, the 25 elephants in Hlane Royal National Park have been confined to only 4,900 hectares of Hlane's approximately 22,000 hectares.

74.   According to FWS, the fourteen elephants in Mkhaya Game Reserve, which covers approximately 10,000 hectares, have been restricted to 1,190 hectares.

75.   In 2014, Big Game Parks once again claimed that the estimated elephant population of 39 exceeded carrying capacity of lands in Swaziland provide as elephant habitat. The Swaziland authorities claimed that the elephants had destroyed the vegetation in their compounds and that it was negatively affecting other species.

76.   Big Game Parks and the Zoos have stated publically that the only option was to cull the elephants or sell them to the zoos. Big Game Parks ignored calls by conservationists and scientist to explore alternatives to this transfer, such as expanding elephant habitat in Swaziland or relocating the elephants to other African countries. Relocation of elephants within Africa has occurred before. At least one African-based organization, groupelephant.com, has offered financial and logistical assistance to Swaziland to either keep the animals or aid in their transfer to other wild habitats in Africa.

77.   The Zoos signed an agreement with Swaziland Big Game Parks on August 28, 2014, agreeing to contribute 450,000 U.S. dollars to Big Game Parks over a period of five years in exchange for elephants of their choosing.

78.   The Zoos' money for the elephants is to be paid to Ngwenya Rhino Fund (NRF). Big Game Parks administers and audits NRF. All NRF projects are to be monitored by Mr. Reilly.

79.   The approval of Big Game Parks' plan to export elephants does not go through an independent party in Swaziland.

80.   The Zoos application indicates that the Big Game Parks' elephant population was

estimated at thirty-nine individuals in 2014.

81.    Thus, the importation of eighteen elephants would reduce Big Game Parks'
population by over forty-five percent.

82.    Importation of the eighteen elephants poses a net harm to the status of African
elephants in the wild. It also interferes with recovery efforts of the species and stimulates
further trade.

83.    The proposed trade would lead to long-term declines that would place the viability
of Swaziland's elephant population in danger, with an increased risk of extinction.

84.    Swaziland has not established a sustainable-use management plan, and the
removal could lead to the over-utilization of the species.

85.    The Zoo's application indicated elephants have become a lower conservation
priority for Swaziland and that Big Game Parks seeks to reduce the population.

86.    Big Game Parks indicated that culling is the least preferred option to reduce its
elephant population.

87.    Non-governmental organizations made concrete pledges to Big Game Parks to:
provide funds to improve the infrastructure (elephant-proof fencing etc.) necessary to keep
the elephants wild in the Swaziland parks; provide Big Game Parks access to the services of
distinguished elephant ecologists who will assist with elephant management issues relating
to space, densities, exclusion and inclusion zones, deterrence zones, etc.; and if absolutely
necessary – relocate the elephants to a safe destination in the region where they will also
not be hunted. These offers of assistance were given under the condition that Swaziland
does not sell its wild elephants to captivity, such as zoos.

**LEGAL BACKGROUND**

A.    **Purported Legal Protections For African Elephants.**

    1.    **The Convention on International Trade of Endangered Species.**

      88.    The Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) is an international agreement between governments aimed to ensure that international trade in specimens of wild animals and plants does not threaten their survival. Participating governments are referred to as Member Parties.

      89.    The United States is a Member Party of CITES and has agreed to regulate the importation and exportation of wildlife, enforce CITES, and prohibit violations of its provisions. 27 U.S.T. 1087 (Mar. 3, 1973).

      90.    International trade in wildlife is regulated under CITES by the listing of species in one of three Appendices.

      91.    Appendix-I species are species threatened with extinction that are or may be affected by trade. CITES, Art. III.

      92.    Trade of Appendix I species is subject to particularly strict regulation and trade is only authorized in exceptional circumstances. CITES, Art. II.

      93.    Elephants from Swaziland are listed on Appendix I of CITES.

      94.    The United States implements certain provisions of the Convention of CITES, through the ESA, which prohibits trade in any specimens contrary to the provisions of the Convention. 16 U.S.C.S. § 1538(c)(1).

      95.    Prior to authorizing the importation of Appendix I species, Member Parties must first make a finding that the proposed import is for purposes that would not be detrimental to the survival of the species. 50 C.F.R. § 23.61(a); CITES, Art., III ¶ 3.

      96.    CITES prohibits the importation of Appendix I species when the purpose of the importation is detrimental to the survival of the species. CITES Art. III, ¶ 3.

97.   CITES prohibits the importation of live Appendix I species if the recipient is not suitably equipped to house and care for the animals.  CITES Art. III, ¶ 3.

98.   CITES prohibits the importation of Appendix I species if the animals are to be used for primarily commercial purposes. CITES Art. III. ¶ 3.

99.    Under CITES, the term "commercial purposes" should be defined "as broadly as possible . . . so that all uses whose non-commercial aspects do not clearly predominate shall be considered to be primarily commercial in nature, " and the entity wishing to import Appendix I listed species has the burden of showing that the intended use of the animals is clearly non-commercial. Resolution Conf. 5.10.

100.   CITES prohibits the importation of Appendix I species for captive breeding programs unless the importer demonstrates that it "has been unable to obtain suitable captive-bred specimens of the same species" and "the proposed purpose could not be achieved through alternative means." Resolution Conf. 5.10.

## 2.   The U.S. Endangered Species Act.

101.   The purpose of the Endangered Species Act (ESA) is to conserve threatened and endangered species and the ecosystems upon which these species depend in the United States and throughout the world. 16 U.S.C. § 1531(b). The Supreme Court recognized that by enacting the ESA, Congress "intended endangered species to be afforded the highest priorities." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 174 (1978).

102.   In enacting the ESA, Congress expressly provided authority for listing non-native species that are deemed endangered in their home ranges in other countries. Congress' decision to include authority for listing of non-native species was based upon a desire to make the United States a leader in protecting species and their ecosystems both domestically and worldwide.

103.    The fundamental method by which the ESA protects threatened and endangered species is its aggressive restrictions on take of ESA-listed species, including the prohibition on the importation of such species into the United States.

104.    The African Elephant, *Loxodonto Africana*, is listed as threatened under the ESA.

105.    Federal Regulations implementing the ESA prohibit the import or export, as well as the possession, sale, and receipt of African elephants, except for in limited circumstances with a valid permit. 50 C.F.R. 17.40(e)(iii)(2); 50 C.F.R. § 23.13.

106.    Under the general permit requirements, FWS may not issue a permit to import African elephants if the applicant: failed to demonstrate a valid justification for the permit and a showing of responsibility; the authorization requested potentially threatens a wildlife or plant population, or the applicant is otherwise not qualified. 50 C.F.R. § 13.21 (b).

107.    In determining whether to issue a permit, "The issuing officer shall consider all relevant facts or information available, and may make independent inquiry or investigation to verify information or substantiate qualifications asserted by the applicant." 50 C.F.R. § 13.21 (d).

108.    Prior to authorizing the importation of elephants from Swaziland, FWS must first make a finding that the proposed import is for purposes that would not be detrimental to the survival of the species. 50 C.F.R. § 23.61(a).

109.    Detrimental activities include any activities that would pose a net harm to the status of the species in the wild. 50 C.F.R. § 23.61(b).

110.    For species listed on Appendix I of CITES, such as the elephants the Zoos seek to import, detrimental activities also include the removal of animals from the wild that results in habitat loss or destruction, interference with recovery efforts, or stimulation of further trade. 50 C.F.R. § 23.61.

111.    In making non-detrimental findings, FWS must also consider whether the biological and management information demonstrates that the proposed activity represents sustainable use, whether removal of the animals from the wild is part of a biologically based sustainable use management plan designed to eliminate over-utilization of the species, whether the proposed activity would lead to long-term declines, whether it would place the viability of Swaziland's elephant population in question, and whether the removal could increase the risk of extinction of the species as a whole or the particular population affected. 50 C.F.R. § 23.61(c).

112.    Non-detrimental findings should be based on the best available biological information, and in cases where insufficient information is available, precautionary measures should be taken and the importation should not be authorized. 50 C.F.R. § 23.61(f)(4).

113.    FWS also should not authorize the importation of the elephants unless it finds that the elephants are not to be used for primarily commercial purposes. 50 C.F.R. § 23.62.

114.    The federal regulations define "commercial" as "related to an activity, including actual or intended import, export, re-export, sale, offer for sale, purchase, transfer, donation, exchange, or provision of a service, that is reasonably likely to result in economic use, gain, or benefit, including, but not limited to, profit (whether in cash or in kind)." 50 C.F.R. § 23.5.

115.    If the noncommercial aspects do not clearly predominate, FWS should consider an import to be for primarily commercial purposes. 50 C.F.R. § 23.62.

116.    The importation of animals for captive breeding program is considered to be for primarily commercial purposes, unless the propagation prioritizes the long-term protection and recovery of the species in the wild. "The captive-breeding or artificial propagation program must be part of a program aimed at the recovery of the species in the

wild and be undertaken with the support of a country within the species' native range. Any profit gained must be used to support this recovery program." 50 C.F.R. § 23.62(c)(5).

117.    Federal regulations also prohibit the importation of wild African elephants unless the importers are suitably equipped to house and care for the animals. 50 C.F.R. § 23.65.

118.    In evaluating whether an applicant is suitably equipped to import wild animals, FWS must examine whether the applicant's enclosures are constructed and maintained so as to provide sufficient space to allow each animal to make normal postural and social adjustments with adequate freedom of movement. Inadequate space may be indicated by evidence of malnutrition, poor condition, debility, stress, or abnormal behavior patterns. 50 C.F.R. § 23.65(c)(1).

**B.      The National Environmental Policy Act.**

119.    The National Environmental Policy Act (NEPA) is our  nation's basic charter for environmental protection.

120.    The fundamental purpose of the NEPA is to improve the decision-making of federal agencies by requiring an analysis of the environmental impacts of a proposed action and an exploration of alternatives to that action that would reduce or eliminate such impacts. 42 U.S.C. § 4332.

121.    Congress enacted NEPA to ensure that all federal agencies examine the environmental impacts of their actions before acting and sought to provide the public with a statutory means to be informed about, and to comment on, the environmental impacts of a proposed agency action.

122.    NEPA requires federal agencies to analyze the environmental impact of a particular federal action before proceeding with that action. *See* 42 U.S.C. § 4332(2)(C).

123.    Accordingly, before a federal agency can act in a way that significantly affects the quality of the human environment, NEPA requires the acting agency to prepare a detailed

Environmental Impact Statement (EIS) that discusses, among other things: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

124.     The EIS is the cornerstone of NEPA. An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The requirement to prepare an EIS is broad and intended to compel agencies to take seriously the potential environmental consequences of a proposed action.

125.     Agencies may prepare an Environmental Assessment (EA) to determine whether a proposed action requires preparation of an EIS or warrants a finding of no significant impact.

126.     An EA must take a "hard look" at the potential consequences of its actions and provide enough evidence and analysis for determining whether to prepare an EIS. Agencies must involve the public, to the extent practicable, in preparing this assessment. 40 C.F.R. § 1501.4 (b).

127.     If the agency decides the impacts of its proposed action are not significant, it must supply a convincing statement of reasons why, and make its Finding of No Significant Impact available to the public. 40 C.F.R. § 1501.4 (e).

128.     A significant effect may exist even if the federal agency believes that, on balance, the effect will be beneficial. 40 C.F.R. §1508.27(b)(1).

129.     Whether in an EA or EIS, an agency must adequately evaluate all potential environmental impacts of the proposed action. *See* 42 U.S.C. § 4332(2)(C). To meet this obligation, the federal agency must identify and disclose to the public all foreseeable impacts of the proposed action, including direct, indirect, and cumulative impacts. See id. § 4332(2); *see also* 40 C.F.R. §§ 1508.7-1508.8.

130.    Over 40 years ago, the D.C. Circuit Court of Appeals stated that the duty

imposed by Section 102(2)(C), although qualified by the phrase "to the fullest extent

possible,":

> Does not provide an escape hatch for footdragging agencies; it does not make NEPA's
> procedural requirements somehow "discretionary." Congress did not intend the Act
> to be such a paper tiger. Indeed, the requirement of environmental consideration "to
> the fullest extent possible" sets a high standard for the agencies, a standard which
> must be rigorously enforced by the reviewing courts.

> *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Com*., 449
> F.2d 1109, 114 (D.C. Cir. 1971).

131.    The capturing, harming harassment, and possible death of wildlife as a result

of human activity approved by the federal government is an impact required to be

evaluated under NEPA. *See* 40 C.F.R. § 1508 ("'Human environment' shall be interpreted

comprehensively to include the natural and physical environment and the relationship of

people with that environment.").

### THE FEDERAL ACTION BEING CHALLENGED: PERMITTING THE IMPORT OF 18 AFRICAN ELEPHANTS FROM SWAZILAND TO U.S. ZOOS

132.    In 2015, FWS's Division of Management Authority (DMA) received an

application from Dallas Zoo Management, doing business as the Dallas Zoo, and working

with the Sedgwick County Zoo in Wichita, Kansas, and Omaha's Henry Doorly Zoo, Omaha,

Nebraska, to import up to 18 wild African elephants (*Loxodonta africana*) from Swaziland

that would be housed at the three Zoos. The elephants intended for importation consist of

three adult females, three subadult intact males, and twelve subadult females.

133.    According to the application, since 2003, Swaziland has implemented a

number of adaptive management strategies to limit elephant population growth, minimize

habitat degradation, and maintain elephant numbers in the two parks so that they do not

exceed carrying capacity. With the financial resources received from the first export of

elephants in 2003, Swaziland purportedly enlarged one of the parks and completely fenced

the other. In 2009, Swaziland was able to secure additional financial support and technological assistance to sterilize seven bull elephants. Despite these efforts, Swaziland has determined the need to reduce further the number of elephants to support biodiversity in the parks, while still maintaining some elephants for tourism and to acknowledge the cultural value of the species in Swaziland. The ultimate goal of the management plan is to balance recruitment (i.e. births) with mortality to achieve a 0% growth rate within each protected area.

134.    Initially, FWS took the position that its consideration of the permit application was categorically exempt from NEPA. This view was based on Department of the Interior internal agency policy and procedures that the issuance, denial, suspension, and revocation of permits for activities involving fish, wildlife or plants, including permits involving species listed under the ESA and CITES, are categorically excluded from the requirement for preparation of an EA or an EIS when such permits cause no or negligible environmental disturbance.

135.    FWS claims it considered whether the issuance of this permit might meet any of the extraordinary circumstances found in its NEPA regulations 43 C.F.R. § 46.215, that require NEPA review even if the action would otherwise be categorically exempt.  FWS found that one criterion, 43 C.F.R. § 46.215 (c), which requires NEPA review if an action may "[h]ave highly controversial environmental effects" required preparation of an EA. Specifically, FWS felt it needed to explore more fully whether this criterion rises to the level of significance as outlined in 40 C.F.R. § 1508.27 (b)(4) specifically for the following potential impacts: 1) animal welfare; 2) Swaziland ecology in the Big Game Parks; 3) U.S. captive elephants; and 4) protected species.

136.    On October 22, 2015, FWS made available a draft EA regarding a permit application submitted by Dallas Zoo Management, on behalf of the Sedgwick County Zoo and Omaha's Henry Doorly Zoo to import elephants from Swaziland.

25

137.    Neither the draft EA nor the application identified which individual animals would be taken, from which part of Swaziland they would be captured, and to which zoos they would be imported and held in captivity.

138.    In the draft EA, FWS failed to adequately disclose and analyze whether these 18 elephants may suffer social, psychological, behavioral, or physical injury from their forcible removal from the habitats, families and fellow herd members.

139.    In the draft EA, FWS failed to adequately disclose and analyze whether the elephants left behind in Swaziland may suffer social, psychological, behavioral, or physical impacts due the forcible removal of the 18 elephants from their families and fellow herd members.

140.    In the draft EA, FWS failed to adequately disclose and analyze whether these 18 elephants may be suffer social, psychological, behavioral, or physical injury due to their confinement when transported from Swaziland to the United States.

141.    In the draft EA, FWS failed to adequately disclose and analyze whether these 18 elephants may suffer social, psychological, behavioral, or physical injury due to lifetime confinement once imported into the United States.

142.    In the draft EA, FWS failed to adequately disclose and analyze whether, as a result of the trauma associated with capture, transport and confinement, these 18 elephants may experience a reduced quality of life, reduced social experiences, a change in emotional state, depression, and a shortened life-span.

143.    In the draft EA, FWS failed to adequately disclose and analyze whether, as a result of FWS's permitting decision, humans will be adversely affected by the confinement of these 18 elephants at the Zoos.

144.    Humans increasingly understand that animals have rich emotional lives, and are affected emotionally and biologically from captivity and abuse in much the same manner as humans. As such, humans also display a wide range of emotions—including outrage and anger—when they learn of an animal suffering. One of the most well known

examples of this is the vilification of NFL quarterback Michael Vick. Even years after being released from federal prison for his role in a horrific dog fighting operation, a large number of Americans continue to believe we should not forget his role in the torture and murder of innocent dogs.

145.    FWS should have disclosed in the draft EA the potential that humans might suffer similar feelings, and potentially find it difficult to visit these Zoos (and others) knowing that these 18 elephants (and others) are suffering social, psychological and physical distress due to their captivity.

146.    Approximately 6,718 conservationists, scientists, and members of the public commented on the Draft EA in opposition to the importation of the elephants.

147.    According to FWS, it received approximately seventy-one substantive comments on the Draft EA.

148.    Some commenters, including Friends of Animals, requested that FWS look at the significant effects of its proposed action, including the social, psychological, behavioral, and physical impacts on the elephants. These comments included evidence on the high level of intelligence and emotions exhibited by elephants that indicates the importation and subsequent confinement in Zoos could be particularly devastating to these animals.

149.    On January 22, 2016, FWS made available the Final EA and FONSI indicating it would authorize the importation of eighteen elephants from Swaziland.

150.    There is no indication in the Final EA or FONSI that FWS consulted with independent scientists or other experts regarding the potential for psychological, social, or physical injury to the elephants if it granted the proposed permit to the Zoos.

151.    FWS did not publically respond to Friends of Animals comments or other substantive comments submitted on the Draft EA.

152.    In the Final EA and FONSI, FWS failed to adequately disclose and analyze whether these 18 elephants may suffer social, psychological, behavioral, or physical injury from their forcible removal from their habitats, families and fellow herd members.

27

153.    In the Final EA and FONSI, FWS failed to adequately disclose and analyze whether the elephants left behind in Swaziland may suffer social, psychological, behavioral, or physical impacts due the forcible removal of the 18 elephants from their families and fellow herd members.

154.    In the Final EA and FONSI, FWS failed to adequately disclose and analyze whether these 18 elephants may suffer social, psychological, behavioral, or physical injury due to their confinement when transported from Swaziland to the United States.

155.    In the Final EA, FWS failed to adequately disclose and analyze whether these 18 elephants may suffer social, psychological, behavioral, or physical injury due to lifetime confinement once imported into the United States.

156.    In the Final EA and FONSI, FWS failed to adequately disclose and analyze whether, as a result of the trauma associated with capture, transport and confinement, these 18 elephants may experience a reduced quality of life, reduced social experiences, a change in emotional state, depression, and a shortened life-span.

157.    In the Final EA and FONSI, FWS failed to adequately disclose and analyze whether, as a result of FWS's permitting decision, humans will be adversely affected by the confinement of these 18 elephants at the Zoos.

158.    FWS's Final EA and FONSI did not fully disclose or analyze the social, physiological, behavioral, and physical impacts on the elephants to be imported and the elephants remaining in Swaziland.

159.    FWS overall failed to provide a convincing statement of reason why the proposed action would not have a significant impact on the human environment.

160.    FWS's failures lead to its ill-informed decision not to prepare an EIS before issuing the permit to authorize the importation of 18 elephants from Swaziland.

161.    FWS informed Friends of Animals that it has issued a permit for Zoos to import 18 elephants from Swaziland.

**FIRST CAUSE OF ACTION**

**(VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT:**
**FAILURE TO ADEQUATELY DISCLOSE AND ANALYZE ENVIRONMENTAL**
**IMPACTS)**

162.    Friends of Animals herein incorporates proceeding allegations.

163.    FWS's EA, FONSI, and Decision permitting the importation of eighteen elephants from Swaziland failed to provide a full and fair discussion of the significant environmental impacts and failed to respond to substantive comments regarding the authorization of such importation.

164.    FWS's approval of the Final EA, FONSI and Permit was in violation of the requirements of NEPA, and should be set aside under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

**SECOND CAUSE OF ACTION**

**(VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT:**
**FAILURE TO PREPARE AN ENVIRONMENTAL IMPACT STATEMENT)**

165.    Friends of Animals herein incorporates proceeding allegations.

166.    The decision to permit the importation of eighteen elephants from Swaziland to Zoos in the United States is a major federal action subject to NEPA.

167.    Before issuing the permit to import eighteen elephants from Swaziland, FWS did not prepare an EIS.

168.    In issuing the Permit without preparing an EIS, FWS's actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedure, in violation of the APA, 5 U.S.C. § 706(2).

**REQUESTED RELIEF**

Friends of Animals respectfully request that this Court enter judgment providing the following relief:

A.      Declare that the Federal Defendants violated NEPA and its implementing regulations by approving the EA, FONSI, Decision Record, and issuing a permit to authorize the importation of elephants in light of Federal Defendants' failure to provide full and fair discussion of significant environmental impacts;

B.      Declare unlawful and set aside Federal Defendants' decision authorizing the importation of elephants from Swaziland until such time as Federal Defendants have complied with the NEPA;

C.      Enjoin Federal Defendants from issuing a permit that authorizes the importation of elephants from Swaziland, unless and until such time as Federal Defendants fully comply with NEPA's requirements;

D.      Award Friends of Animals' costs, including reasonable attorney fees under the Equal Access to Justice Act (5 U.S.C. § 504; 28 U.S.C. § 2412); and

E.      Grant Friends of Animals any other relief that the Court deems just and proper.

Respectfully submitted this 9th day of February, 2016.

<div style="margin-left:40%">

/s/ Jennifer Best
Jennifer Best (DC Bar# CO0056)
Assistant Director, Wildlife Law Program
Friends of Animals
7500 E. Arapahoe Rd., Ste. 385
Centennial, CO 80112
Telephone (720) 949-7791
jennifer@friendsofanimals.org

/s/ Michael Harris
Michael Ray Harris (DC Bar # CO0049)
Director, Wildlife Law Program
Friends of Animals
7500 E. Arapahoe Rd., Ste. 385
Centennial, CO 80112
Telephone (720) 949-7791
michaelharris@friendsofanimals.org

</div>